## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LONI SMITH MCKOWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:17-cv-04659-JRS-MJD |
| | ) | |
| BUTLER UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S RESPONSE OPPOSING
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Loni Smith McKown, by counsel, respectfully requests that the Defendant's Motion for Summary Judgment be denied in its entirety based upon the following:

### I.    INTRODUCTION

Ms. McKown worked for the Defendant, Butler University ("Defendant"), as a Professional Practice Professor on a term contract basis. Near the end of each contract, Defendant conducted a contract renewal review whereby Ms. McKown was reviewed by a Departmental Committee and a Professional Standards Committee. Each committee gave a recommendation to the Dean, Gary Edgerton ("Edgerton"), who decided whether to renew Ms. McKown's contract.

In September 2015, Ms. McKown complained to Edgerton about his sex, age and religious bias against her. He was "shocked" and said, "I can't believe she did this. She's coming up for renewal. A part of me is looking forward to reviewing her." At deposition, he admitted he was frustrated by Ms. McKown's complaint of discrimination.

Ms. McKown filed her initial Charge of Discrimination ("Charge") alleging sex, age, and religious discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") in December 2015.  Edgerton had knowledge of Ms. McKown's EEOC Charge before he made the

decision to not renew her teaching contract.  In February 2016, Director of the School of Journalism Dr. Nancy Whitmore filed a Title IX complaint against Edgerton alleging that he was retaliating against Ms. McKown because of her complaint of discrimination.[1]  Edgerton was then investigated by Defendant's Title IX Coordinator over the next few months. Ms. McKown filed her amended EEOC Charge in March 2016. On April 20, 2016, Edgerton received a report from the Title IX Coordinator, reiterating Ms. McKown's complaints of discrimination and reminding Edgerton of the same just nine days before he decided not to renew Ms. McKown's contract. As a result, Ms. McKown's complaints were on Edgerton's mind from the time they were made right up until April 29, 2016, when he made his decision not renew her contract.

Edgerton fired Ms. McKown the first chance he had after her complaint: her predetermined 2016 contract renewal review. He chose not to renew Ms. McKown's contract despite five of the seven review committee members recommending renewal, despite the Director of the School of Journalism and Chair of the Departmental Committee recommending renewal, and despite Ms. McKown's three prior years of positive performance ratings.

Ms. McKown is now before the Court with three retaliation claims against Defendant based upon her termination: two under Title VII of the Civil Rights Act of 1964 ("Title VII") and one under the Age Discrimination in Employment Act of 1967 ("ADEA"). For each, summary judgment is inappropriate.

---

[1] Defendant omitted any reference to Dr. Whitmore's Title IX complaint in its brief, "cherry-pick[ing]" evidence from the record that supports only its defenses. [*See* Document 35.] Dr. Whitmore's complaint is an undisputed fact that is integral to Ms. McKown's claims.  Defendant's litigation approach hinges on "the hope that the Court … would not take the time to check the record."  *Malin v. Hospira*, 762 F.3d 552, 564-565 (7th Cir. 2014). Such practice quickly destroys Defendant's credibility with the Court.  *Id.*

## II.      STATEMENT OF THE FACTS[2]

### A.      Ms. McKown turned around *The Collegian*.

Ms. McKown started working for Defendant in 2010. [McKown Ex. 1 (McKown Dep. at 16:6-11).] From 2012 forward, she worked as a Professional Practice Professor in the School of Journalism, which is in the College of Communications. [Document 35 at 2, 5.] Edgerton was the Dean of the College of Communications. [*Id.*] He rated her as "Meets Expectations" in 2012 and "Above Expectations" 2013. [McKown Exs. 6, 7; Document 35 at 5.]

Ms. McKown also served as a faculty advisor to *The Collegian*, which is Defendant's student newspaper. [Document 35 at 7.] After she started in that role, the paper and the students involved started winning awards for the first time. [McKown Ex. 5 (Taylor Dep. at 29:4-19).] Ms. McKown turned *The Collegian*, an unprofessional paper with hit-or-miss success, into a professional paper from which students were actually learning how to do real journalism. [McKown Ex. 3 (Dr. Whitmore Dep. at 37:1-43:7).]

### B.      The contract renewal review process.

All of Defendant's non-tenured professors, including Ms. McKown, were employed per term contracts. [Document 35 at 3.] Toward the end of each contract, Defendant would conduct a contract renewal review to determine whether to renew the professor's contract. [*Id.* at 3; McKown Ex. 11 at 2.] First, the professor would create a dossier, which contained teaching evaluations, student evaluations, a narrative of the professor's teaching reflections and philosophies, written teaching standards, assignments, tests, objectives, letters from students, peer review teaching reports, a list of service activities, awards students won, and a description of presentations and

---

[2] This section contains a general statement of the facts of this case, not an exhaustive recitation of all relevant facts which are proffered throughout this Response and/or which may be proffered at the trial of this matter. All facts and reasonable inferences in this section are drawn in Ms. McKown's favor per the standard of review for summary judgment. *See, e.g., Volovsek v. Wisconsin Dept. of Agric.*, 344 F.3d 680, 696 (7th Cir. 2003).

conferences. [McKown Ex. 3 (Dr. Whitmore Dep. at 23:10-25:6); McKown Ex. 2 (Edgerton Dep. at 15:8-21, 27:3-17); Document 35 at 3; McKown Ex. 11 at 2.]

Next, the Departmental Committee, which was comprised of members of the professor's department, would review the dossier and issue a written report recommending either contract renewal or non-renewal. [Document 35 at 3; McKown Ex. 11 at 2; McKown Ex. 2 (Edgerton Dep. at 15:8-16:11).] After that, the Professional Standards Committee did the same. [Document 35 at 4; McKown Ex. 11 at 2; McKown Ex. 2 (Edgerton Dep. at 15:8-21).]

The Departmental Committee knew a professor's work better than the Professional Standards Committee because the Departmental Committee is made up of faculty in the professor's department whereas the Professional Standards Committee is made up of faculty outside of the department. [McKown Ex. 5 (Taylor Dep. at 32:15-33:3); McKown Ex. 2 (Edgerton Dep. at 19:20-20:2).] Thus, the Departmental Committee's recommendation was weighted slightly more heavily than the Professional Standards Committee's recommendation. [McKown Ex. 5 (Taylor Dep. at 33:17-34:14).]

Finally, the Dean would review the dossier and the committees' recommendation reports and issue a final written report either renewing or not renewing the professor's contract. [Document 35 at 4-5; McKown Ex. 11 at 2; McKown Ex. 2 (Edgerton Dep. at 15:8-21, 20:23-21:20).]

### C.    **Ms. McKown's contract was renewed in 2014, and she continued to perform well.**

Ms. McKown had a contract renewal review in 2014. [Document 35 at 6; McKown Exs. 13, 14.] Her Departmental Committee and Professional Standards Committee unanimously recommended a three-year renewal. [Document 35 at 6.] Edgerton followed the committees'

recommendations and renewed her contract for three years. [Document 35 at 6; McKown Ex. 12.] Ms. McKown's next contract renewal review was set for 2016. [Document 35 at 6.]

Edgerton rated Ms. McKown as "Above Expectations" for 2014. [Document 35 at 6; McKown Ex. 8.] The Director of the School of Journalism, Dr. Whitmore, also conducted annual performance reviews of Ms. McKown. [McKown Ex. 3 (Dr. Whitmore Dep. at 37:1-38:1-11, 38:19-41:19).] Even though Ms. McKown had some negative student evaluations, Dr. Whitmore always rated her as exceeding expectations because she determined that those student evaluations reflected that she was a demanding teacher, not a poor teacher. [*Id.*]

In August 2015, Ms. McKown was removed from being a faculty advisor to *The Collegian* for forwarding a confidential email to a student on the paper. [Document 35 at 8; McKown Ex. 2 (Edgerton Dep. at 44:14-46:14).] Ms. McKown acknowledged that she forwarded the email and apologized, explaining that she did not realize the email was confidential. [Document 35 at 8.] Nevertheless, Dr. Whitmore rated Ms. McKown's performance as an advisor to *The Collegian* as exceptional. [[McKown Ex. 3 (Dr. Whitmore Dep. at 41:10-42:4.] *The Collegian* was having success like it never had before and students were winning national awards. [*Id.*] Before Ms. McKown, *The Collegian*'s success varied: some years were a little better than others, but it was not a professional paper. [*Id.* at 42:5-8.] That all changed when Ms. McKown became an advisor: she taught the students organization and management, the students were really starting to understand how to do journalism, and the students were winning national awards, including one which was only given out once each year throughout the entire country. [*Id.* at 42:9-43:17.] Under Ms. McKown, *The Collegian* had "phenomenal success" and had "never done anything like that before, not even close." [*Id.* at 42:9-43:17.]

###### D.        Edgerton reacted negatively to Ms. McKown's protected complaint.

On September 2, 2015, during a meeting with Edgerton and Dr. Whitmore, Ms. McKown read a prepared statement in which she accused Edgerton of harboring and acting upon sex, age and religious bias against her. [Document 35 at 8-10; McKown Ex. 2 (Edgerton Dep. at 48:15-52:16).] Edgerton was shocked. [Document 35 at 10.] After Ms. McKown left the meeting, he said, "I can't believe she did this. She's coming up for renewal. A part of me is looking forward to reviewing her." [Document 35 at 22; McKown Ex. 3 (Dr. Whitmore Dep. at 71:6-19).] His statement caused Dr. Whitmore to think that Ms. McKown would not be renewed. [McKown Ex. 3 (Dr. Whitmore Dep. at 71:6-19).] Then, in a September 2015 email chain, Edgerton wrote:

> Loni [McKown] is utilizing her surrogates to malign me, the School of Journalism, the college, and Butler. She is also an employee at Butler. At some point, that's got to become an HR matter. She's already refused to meet with HR to explain how I've shown bias towards her because she's a woman, her age, and her Jewish heritage.

[Document 35 at 25, citing Def. Ex. B (Edgerton Dep. Ex.10 at BU000888).] Edgerton's deposition testimony shows that he was frustrated by Ms. McKown's complaint of bias, and he thought she was trying to paint him, Defendant, and Defendant's College of Communications in a bad light. [McKown Ex. 2 (Edgerton Dep. at 54:21-56:8).]  At deposition, when Edgerton was asked, "So did you feel that Ms. McKown was trying to malign you with her statements about discrimination?", he responded, "I thought she was trying to put the college, me, Journalism, and Butler in as bad a light as possible." [McKown Ex. 2 (Edgerton Dep. at 54:21-59:13).] He was then asked, "And did that upset you?", and he replied, "It frustrated me." [*Id.*] A few questions later, he was asked, "Is there anything else about that process that was frustrating to you or that stood out to you about Ms. McKown and her complaints of discrimination?" [*Id.*] Before he could respond, Defendant's counsel improperly interjected a speaking objection, stating, in part, "I think

what he testified to was he's talking about malign me, he was talking about her statements to the media, not about her complaint." [*Id.*] Following Defendant's counsel's lead, Edgerton attempted to backtrack and change his prior testimony. [*Id.*] Edgerton did not testify that he was frustrated by a fear of media attention until the suggestion was made by Defendant's counsel. [*Id.*] Indeed, the first the time the term "media" was mentioned during Edgerton's deposition in that context was when it was brought up by Defendant's counsel. [McKown Ex. 2 (Edgerton Dep. at 54:21-59:13).]

### E.   Ms. McKown's EEOC Charge and other reminders of her complaints of discrimination.

On September 30, 2015, Ms. McKown met with Human Resources ("HR") regarding her complaint of discrimination. [Document 35 at 20.] Edgerton knew about the meeting at the time. [*Id.*]

In December 2015, Ms. McKown filed an EEOC Charge alleging that Edgerton discriminated against her because of her sex, age, and religion.  [McKown Ex. 24.]  Upon deposition, Edgerton testified that he did not know that Ms. McKown had filed an EEOC Charge. [McKown Ex. 2 (Edgerton Dep. at 49:12-20).] But, in his January 12, 2016 response to Ms. McKown's internal grievance, he specifically referenced her EEOC Charge, stating: "Ms. McKown has filed an EEOC charge against the university …." [McKown Ex. 27 at 4.]

On February 13, 2016, Dr. Whitmore made a Title IX complaint, alleging that Edgerton retaliated against Ms. McKown for her September 2, 2015 protected complaint. [McKown Ex. 10 at 3; McKown Ex. 3 (Dr. Whitmore Dep. at 52:13-53:16); McKown Ex. 4 (Patterson Dep. at 32:1-14).] Title IX Coordinator Stacie Colston Patterson ("Patterson") sent Edgerton a letter about Dr. Whitmore's complaint. [McKown Ex. 4 (Patterson Dep. at 17:6-23, 19:13-16, 22:12-24:10).] After that, she spoke with Edgerton about it. [*Id.* at 4:11-13, 7:23-8:11, 19:17-25.] She then followed up

with an email to him, asking for additional documents relevant to the complaint. [*Id.* at 29:11-30:2.] Patterson also interviewed Edgerton about it. [McKown Ex. 2 (Edgerton Dep. at 29:11-30:2, 59:18-61:1, 63:15-18).] Then, on February 29, 2016, Title IX Advisor Chad Bauman ("Bauman") emailed Edgerton about the complaint. [McKown Ex. 16.] Ms. McKown filed another EEOC Charge in March 2016. [McKown Ex. 25.] Finally, on April 20, 2016, Patterson emailed Edgerton her investigation report regarding Dr. Whitmore's complaint that he retaliated against Ms. McKown based upon her September 2, 2015 protected complaint.[3] [McKown Ex. 17.]

### F.   Edgerton chose not renew Ms. McKown's contract.

In January 2016, Ms. McKown submitted her dossier for her 2016 contract renewal review. [Document 35 at 14.] At that time, Ms. McKown's supervisor was Dr. Whitmore, and her second-level supervisor was Edgerton. [McKown Ex. 2 (Edgerton Dep. at 11:6-13).] Her Departmental Committee reviewed her dossier and issued a report unanimously recommending that her contract be renewed for three years. [Document 35 at 14; McKown Ex. 19; McKown Ex. 2 (Edgerton Dep. at 70:1-9).] The Departmental Committee had three members, and Director Dr. Whitmore was the Chair. [*See* McKown Ex. 19; McKown Ex. 3 (Dr. Whitmore Dep. at 9:1-5, 17:4-8).] Then, her Professional Standards Committee reviewed her dossier and the Departmental Committee's report and issued a split vote: two members for renewal and two members for non-renewal. [Document 35 at 14; McKown Ex. 18; McKown Ex. 2 (Edgerton Dep. at 69:1-25).] Professor Christine Taylor, who was on the Professional Standards Committee, found the Departmental Committee's report to be consistent with what she saw in Ms. McKown's dossier. [McKown Ex. 5 (Taylor Dep. at 35:12-

---

[3] Patterson's report did not find a Title IX violation [McKown Ex. 17], but Patterson could not recall even one time when she did find a Title IX violation during her tenure as Title IX Coordinator for Defendant [McKown Ex. 4 (Patterson Dep. at 28:2-29:10)].

23, 36:15-37:14).] In all, five of seven committee members recommended that Ms. McKown's contract be renewed. [McKown Exs. 18, 19.]

Despite a majority of his and Ms. McKown's peers recommending that Ms. McKown's contract be renewed, Edgerton decided not to renew Ms. McKown's contract on April 29, 2016. [Document 35 at 14, 20; McKown Ex. 11 at 5; McKown Ex. 20; McKown Ex. 2 (Edgerton Dep. at 7:16-19, 13:19-14:2, 26:24-27:2, 66:10-16).] As a result, Ms. McKown's employment officially terminated after the 2017 spring semester when her contract expired. [Document 35 a 16; McKown Ex. 2 (Edgerton Dep. at 7:23-8:2).]

### III.    STATEMENT OF MATERIAL FACTS IN DISPUTE[4]

1.    Ms. McKown was meeting Defendant's legitimate performance expectations. [*See infra* pp. 15-16.] Defendant denies this fact. [Document 35 at 26-31.]

2.    Edgerton's statement, "I can't believe she did this. She's coming up for renewal. A part of me is looking forward to reviewing her," was about Ms. McKown's complaint of sex, age and religious bias. [*See infra* pp. 12-13.] Defendant denies this fact. [Document 35 at 22-26.]

3.    Edgerton was frustrated by Ms. McKown's complaint about his sex, age and religious bias. [*See infra* pp. 12-13.] Defendant denies this fact. [Document 35 at 22-26.]

4.    Edgerton's September 2015 email is evidence of retaliation. [*See infra* pp. 12-13.] Defendant denies this fact. [Document 24-26.]

5.    Edgerton knew about Ms. McKown's EEOC Charge. [*See infra* p. 19.] Defendant denies this fact. [Document 35 at 17-32.]

---

[4] In this section, as well as in this Response more broadly, Ms. McKown focuses only on disputed facts material to Defendant's Motion. In the event that this matter is tried before a jury or the Court, Ms. McKown reserves the right to dispute all facts as represented by Defendant, including those not explicitly disputed in this section.

6.      Ms. McKown has shown suspicious timing. [*See infra* pp. 20-23.] Defendant denies this fact. [Document 35 at 18-21.]

7.      Edgerton terminated Ms. McKown because of her protected complaint. [*See supra* pp. 1-10; s*ee infra* pp. 10-24.] Defendant denies this fact. [Document 35.]

8.      Ms. McKown's 2013 contract renewal review, as compared to her 2016 review, is evidence of retaliation. [*See infra* pp. 13-14.] Defendant denies this fact. [*See* Document 35.]

## IV.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The burden of proof lies with the movant. *Doe v. R.R. Donnelly & Sons, Co.,* 42 F.3d 439, 443 (7th Circuit 1994).  Courts must view the facts and draw all reasonable inferences in a light most favorable to the non-moving party. *Volovsek*, 344 F.3d at 696.

## V.      ARGUMENT

Title VII and the ADEA prohibit employers from retaliating against employees for opposing unlawful employment discrimination.  42 U.S.C. § 2000e-3 (Title VII); 29 U.S.C. § 623(d) (ADEA). To prove her retaliation claims, Ms. McKown can show: (1) that she engaged in protected activity; (2) that she was subjected to an adverse employment action by Defendant; and (3) that there was a causal link between the protected activity and the adverse employment action. *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012) (Title VII); *Everroad v. Scott Truck Sys., Inc.,* 604 F.3d 471, 481 (7th Cir.2010) (ADEA).  The first two prongs are not in dispute. [*See* Document 35 1-32.]

It is undisputed that Ms. McKown engaged in protected activity under Title VII and the ADEA when she: (1) complained to Edgerton on September 2, 2015 that he harbored and acted

upon sex, age and religious bias against her; and (2) filed her EEOC Charge in December 2015.[5] [Document 35 at 8-10, 18-21; McKown Ex. 2 (Edgerton Dep. at 48:15-52:16)]; *see Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.*, 555 U.S. 271 (2009) (complaining about discrimination is protected activity under Title VII); *see Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012) (complaining about discrimination is protected activity under ADEA). Defendant also does not dispute that Ms. McKown suffered an adverse employment action when Edgerton decided not to renew her contract resulting in her termination. [Document 35 at 14, 16, 20; McKown Ex. 11 at 5; McKown Ex. 20; McKown Ex. 2 (Edgerton Dep. at 7:16-8:2, 13:19-14:2, 26:24-27:2, 66:10-16)]; *see Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007) (termination is an adverse employment action).

Therefore, the remaining issue for Ms. McKown's retaliation claims is "whether the evidence would permit a reasonable factfinder to conclude that [her protected activity] caused [her] discharge…." *Ortiz v. Werner Enterprises., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Ms. McKown is not bound by the *McDonnell Douglas* method. *David v. Bd. of Trustees. of Community College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *see Ortiz*, 834 F.3d at 759-761. She need only present evidence, regardless of how organized or categorized, which would permit a reasonable jury's conclusion of retaliation. *See Ortiz*, 834 F.3d at 760. The Seventh Circuit, in *Troupe v. May*

---

[5] Ms. McKown's retaliations claims are actionable regardless of whether her discrimination complaints were ultimately meritorious. *See Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (providing that employers are forbidden from retaliating against employees who raise discrimination claims regardless of whether those claims are meritless). Defendant purports that Ms. McKown admitted that she had no proof of discrimination. [Document 35 at 18.] However, Ms. McKown felt that she was being discriminated against because she was being treated differently than other faculty members. [McKown Ex. 1 (McKown Dep. at 42:12-16).] She noted that Edgerton did not follow proper processes in removing her as an advisor to *The Collegian*, that she experienced increased and relentless examination under a microscope, and that Edgerton overreacted by removing her from the paper for a minor offense. [*Id.* at 10, 18-19.] She made her complaints of discrimination based on what she saw, heard and felt. [*Id.* at 140:1-141:14.] She noted that the words Edgerton focused on in Ms. McKown's student evaluations, like "harsh, unkind [and] discouraging," are words loaded with gender bias typically used to denigrate female professors. [*Id.* at 50:24-51:6, 74:7-10, 75:6-9; Document 35 at 15, 26-28.] Ms. McKown's discrimination claims have a factual basis and were made upon genuine belief.

*Department Stores Co.*, identified various types of evidence that support a finding of employment discrimination, including ambiguous statements, suspicious timing and Defendant's treatment of similarly situated employees. *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). In *Reeves v. Sanderson Plumbing Products, Inc.*, the U.S. Supreme Court found that evidence that a defendant's explanation for an adverse employment action being "unworthy of credence" is another form of evidence which is probative of discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 430 U.S. 133 (2000); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003). Importantly, "[e]ach type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Id.*

Edgerton made statements that a reasonable jury could conclude show he harbored retaliatory animus towards Ms. McKown and acted upon it in not renewing her contract. Ms. McKown also presents evidence that she was treated better by Edgerton before she complained, that the timing between her complaint and her non-renewal was suspicious, and that Edgerton's reasons for her non-renewal are pretextual. Accordingly, summary judgment is inappropriate.

### A.      Edgerton's retaliatory statements.

Ms. McKown complained to Edgerton on September 2, 2015 about him harboring and acting upon sex, age and religious bias against her. [*See supra* pp. 6-8.] Edgerton was shocked, and after she left the meeting, he said, "I can't believe she did this. She's coming up for renewal. A part of me is looking forward to reviewing her." [Document 35 at 10, 22; McKown Ex. 3 (Dr. Whitmore Dep. at 71:6-19).] While Defendant argues that Edgerton's statement was about other parts of Ms. McKown's statement [Document 35 at 22-26], a jury could reasonably find that Edgerton's statement was about Ms. McKown's protected complaint, especially considering: (1)

12

Edgerton testified he was frustrated by Ms. McKown's protected complaint and only changed his testimony to say his frustration was with media attention after being led by counsel; and (2) he showed frustration with her complaint in a subsequent email. [*See supra* pp. 6-7.]  Edgerton's false testimony that he had no knowledge of Ms. McKown's EEOC Charge also lends credence to the inference that his foregoing statement was about Ms. McKown's complaint; indeed, if Ms. McKown's protected complaints truly did not bother him or inform his decision-making, he would not have lied. A jury must decide what Edgerton's statement meant, that is, if it was about Ms. McKown's protected complaint. On summary judgment, those inferences must be drawn in Ms. McKown's favor. *See Volovsek*, 344 F.3d at 696.  By that standard, Edgerton's foregoing statement was about Ms. McKown's protected complaint and shows that his intent was to retaliate against Ms. McKown's in her upcoming 2016 contract renewal review.  That is exactly what he did when he chose not to renew her contract, thereby terminating her.  As such, summary judgment should be denied.

> **B.**    **Edgerton treated Ms. McKown better before she complained about discrimination.**

McKown is her own comparator:  a comparison of Ms. McKown's 2013 contract renewal review and her 2016 contract renewal review creates an inference of retaliation.  [Document 5 at 3; McKown Ex. 9 at 3; McKown Ex. 1 (McKown Dep. at 31:4-15).]  Her 2013 Departmental Committee recommendation was split: two of the three members voted to renew Ms. McKown's contract for one year; and the other member voted not to renew her contract. [Document 35 at 4; McKown Ex. 9 at 3; McKown Ex. 22.]  Her 2013 Professional Standards Committee voted not to renew her contract. [Document 35 at 4; McKown Ex. 9 at 3; McKown Ex. 21.]  However, Edgerton ultimately renewed Ms. McKown's contract for one year.  [Document 35 at 5; McKown Ex. 9 at

3; McKown Ex. 23.] At that time, Ms. McKown had never made a protected complaint. [Document 35 at 10; McKown Ex. 9 at 4.]

In 2016, Ms. McKown's Departmental Committee unanimously voted to renew her contract and her Professional Standards Committee was neutral: five of seven committee members voted for renewal in all. [See supra pp. 8-9.] Despite this, Edgerton decided not to renew her contract. [McKown Ex. 20.]  Therefore, Ms. McKown serves as her own comparator:

•      Her 2013 review committees' recommendations were not favorable, but she had not made a protected complaint and was renewed by Edgerton; whereas

•      Her 2016 review committees' recommendations were favorable, but she had complained and was not renewed by Edgerton.

A reasonable jury could conclude that Edgerton's disparate treatment of Ms. McKown pre- and post-complaint was motivated by retaliation; and, therefore, summary judgment should be denied.

**C.      Evidence of Pretext.**[6]

"In an employment discrimination case, an employee can survive a motion for summary judgment on the issue of pretext if he produces evidence that calls into question the employer's proffered reasons for dismissal."  *O'Connor v. DePaul University*, 123 F.3d 665, 670 (7th Cir. 1997).  "If the employee succeeds in casting doubt on the proffered reasons for dismissal, the ultimate question of whether the employer discriminated against the employee must be left for a jury to consider."  *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

---

[6] Defendant argues that, even if Ms. McKown proves retaliation, she must also separately and additionally show pretext to prevail.  [Document 35 at 29-31].  Despite Defendant's claim, Ms. McKown is not limited to the outdated confines of *McDonnell Douglas*.  *David*, 846 F.3d at 224; *Ortiz*, 834 F.3d at 760. While Ms. McKown does show pretext, she is not required to show it additionally and separately from other evidence; instead, she need only present evidence that could permit a reasonable factfinder to find retaliation. *See Ortiz*, 834 F.3d at 760.

**1.    Ms. McKown was meeting expectations at the time of her termination.**

Evidence that Ms. McKown was meeting expectations at the time Edgerton made the decision not to renew her contract draws his proffered reason for her termination into doubt.

Whether an employee satisfied her employer's legitimate business expectations asks not whether the employee satisfied her employer's legitimate employment expectations "in the subjective sense" but rather "whether the employee is able to put on objective evidence that [s]he is sufficiently competent to satisfy the legitimate expectations of an employer." *Pilditch v. Board of Education of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993); *McKinney v. Off. of Sheriff of Whitley County*, 866 F.3d 803, 813 (7th Cir. 2017). Whether the employer subjectively believed the employee satisfied its legitimate performance expectations is a question reserved for pretext analysis. *McKinney*, 866 F.3d at 813. Here, a reasonable jury could find that Ms. McKown objectively met Defendant's legitimate performance expectations.

Ms. McKown's performance was rated as meeting expectations in 2012 and as exceeding expectations in 2013 and 2014. [McKown Exs. 6, 7, 8.] She did not receive a performance review for 2015, the year immediately preceding her termination. For her 2016 contract renewal review, the Departmental Committee voted unanimously that her contract should be renewed. [*See supra* pp. 8-9.] The recommendation of the Professional Standards Committee was neutral. [*See supra* pp. 8-9.] In all, five of seven faculty members found that Ms. McKown was meeting expectations and that her contract should have been renewed. [*See supra* pp. 8-9.] Even including Edgerton, five of eight people found that she was meeting expectations and that her contract should have been renewed. [*See supra* pp. 8-9.]

Moreover, Director of the School of Journalism and Departmental Committee Chair Dr. Whitmore recommended that Ms. McKown be renewed because Ms. McKown had excellent

service credentials, her contribution to the profession was great, and she had good scores. [McKown Ex. 3 (Dr. Whitmore Dep. at 65:5-66:4).] Dr. Whitmore found that Ms. McKown had good scores on meeting objectives, that students were learning, and that she received lovely letters from students. [*Id.*] According to Dr. Whitmore, Ms. McKown sort of got painted one way but in looking at the whole picture she was not how she was painted to be. [*Id.*] Moreover, Dr. Whitmore observed that before Ms. McKown, Defendant never had any student placed in a journalism position except maybe a small weekly paper, but after her time there, Defendant had students walking out its doors and into national news organizations. [*Id.*] Dr. Whitmore found that Ms. McKown was a good teacher. [*Id.*] She also rated Ms. McKown's role with the student paper as exceptional. [*See supra* p. 5.]

As a result, a jury could reasonably find that Ms. McKown was objectively meeting her performance expectations.

### 2.      Edgerton's proffered reasons for non-renewal are pretextual.

Edgerton alleged that he decided not to renew Ms. McKown's contract in 2016 because she was not meeting performance expectations. [*See* Document 35 at 17-32.] However, the Departmental Committee, including its Chair, who was also Director of the School of Journalism, told him that Ms. McKown was meeting expectations and that her contract should be renewed. [See supra pp. 8-9.] In all, five of seven committee members found that Ms. McKown was meeting expectations and recommended renewal. [*See supra* pp. 8-9.] Edgerton knew that Ms. McKown was meeting expectations and that her contract should have been renewed, but he chose not to renew her anyway.

Edgerton offered pretextual reasons in an attempt to conceal his retaliatory motives.  He first tried to exculpate himself by claiming that the Departmental Committee did not consider Ms.

McKown's removal from *The Collegian* in making its decision. [McKown Ex. 11 at 5; McKown Ex. 2 (Edgerton Dep. at 74:8-75:7).] However, Dr. Whitmore, who chaired the Departmental Committee, was intimately involved in Ms. McKown's removal from the paper along with Edgerton. [Document 35 at 7-11.] Defendant now claims that Edgerton did not believe that any members of the Departmental Committee "besides Dr. Whitmore" considered Ms. McKown's removal from the paper. [Document 35 at 16.] But, that is not what he said. He said the committees were not aware of the circumstances surrounding her removal from the paper, period. [McKown Ex. 11 at 5; Ms. McKown Ex. 20 at 5; McKown Ex. 2 (Edgerton Dep. at 74:8-75:7).] He said that despite knowing that Dr. Whitmore was aware of such circumstances. [McKown Ex. 11 at 5; Ms. McKown Ex. 20 at 5; McKown Ex. 2 (Edgerton Dep. at 74:8-75:7).] Indeed, Dr. Whitmore was aware of Ms. McKown's removal from the paper at the time the 2016 Departmental Committee was considering her renewal, and the Committee took that into account. [McKown Ex. 3 (Dr. Whitmore Dep. at 62:22-63:14).]

The record also shows that Edgerton's claim that he was motivated by Ms. McKown's students' evaluations is pretextual.  Defendant admits that those student evaluations were mixed: some were negative and some were positive. [Document 35 at 15.] Indeed, even the student evaluations which Defendant cited as being "extremely negative" included comments like: "I've learned a lot"; "I admit that I have made progress as a journalist and have become a better writer"; and "The class taught me a lot." [Document 35 at 15.] Ms. McKown testified that she received just as many flattering student comments as unflattering ones. [McKown Ex. 1 (McKown Dep. at 40:5-12).] Importantly, student evaluations alone have never caused Edgerton not to renew a professor. [McKown Ex. 2 (Edgerton Dep. at 31:7-23).] Edgerton admits that the renewal decision involves a bigger picture than student evaluations alone. [*Id.*] Student evaluations have some value, but they

are subject to bias and are not the "end-all-be-all." [Id. at 25:22-26:12.] That is why Dr. Whitmore likes to see teaching reflections, syllabi, and assignments, which can tell her more than the student evaluations. [Id. at 26:12-16.] The IDEA student evaluations are problematic because "[n]obody understand[s] what the adjusted [scores] mean [or] why it gets adjusted the way it does." [Id. at 26:17-27:4]. Additionally, Ms. McKown received just as many positive student comments as she did negative. [McKown Ex. 1 (McKown Dep. at 40:5-12).]

Finally, Edgerton alleges that Ms. McKown's enrollment levels show she was not meeting expectations regarding her teaching. [Ms. McKown Ex. 11 at 5.] However, at deposition, he admitted that the number of students who signed up for her classes had nothing to do with the quality of her teaching. [McKown Ex. 2 (Edgerton Dep. at 77:19-78:11).]

Edgerton knew that Ms. McKown was meeting expectations and that her contract should be renewed. Indeed, five of seven review committee members told him that. He chose not to renew Ms. McKown anyway, supplying suspicious explanations to support his decision. Edgerton's narrow focus on a few negative student evaluations, which "nobody understands," his disregard of Ms. McKown's dossier and the committee recommendations, and his deposition testimony which contradicts his previously-stated reasons for termination show that his evaluation was not honest but tainted by retaliatory animus. While courts "cannot set guess [an employer's] employment decisions to the extent that they were innocently unwise or unfair[,]" if sufficient evidence is present to allow a factfinder to genuinely call into question [the employer's] honesty, a plaintiff can survive summary judgment. *See Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 200 (7th Cir. 2011). Ms. McKown has done just that.

### 3.     Edgerton lied about his knowledge of Ms. McKown's EEOC Charge.

Edgerton claims he had no knowledge of Ms. McKown's EEOC Charges. [McKown Ex. 2 (Edgerton Dep. at 49:12-20).] But, in his January 12, 2016 response to Ms. McKown's internal grievance he specifically referenced the EEOC Charge, stating: "Ms. McKown has filed an EEOC charge against the university …." [McKown Ex. 27 at 4.] A reasonable jury could conclude that Edgerton's lying about his knowledge of Ms. McKown's EEOC Charge was an attempt to conceal his true retaliatory motive and exculpate himself from any wrongdoing. Evidence that calls the Defendant's truthfulness into question precludes summary judgment. *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995). It is not the Court's job at the summary judgment stage to make credibility calls, and employment discrimination cases often center on parties' intent and credibility, which must go to a jury unless "no rational factfinder could draw the contrary inference." *Veprinsky v. Flour Daniel, Inc.*, 87 F.3d 881, 894 (7th Cir. 1996).

### 4.     Edgerton's prior treatment of Ms. McKown is evidence of pretext.

Edgerton's markedly harsher treatment of Ms. McKown following her protected complaints [*see supra* pp. 13-14] is also evidence that his proffered reason for her termination (poor performance) is pretext for discrimination. *See McKinney*, 866 F.3d at 810. If an employee offers evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of witnesses. *Collier v. Budd Co.,* 66 F.3d 886, 893 (7th Cir. 1995).

### 5.     Credibility concerns should be resolved by a jury.

Defendant relies heavily upon the testimony of its own employees who were implicated in Ms. McKown's claims of retaliation. [*See* Document 35.] Employees of the defendant are not disinterested witnesses. *Sapperstein v. Hager*, 188 F.3d 852, 856 (7th Cir. 1999). They are subject

to the defendant's influence and, in a sense, under the defendant's power. *Id.* A court, in ruling on summary judgment, "must disregard all evidence favorable to the moving party that the jury is not required to believe" and should give credence to evidence supporting the moving party only if it is uncontradicted, unimpeached, and comes from disinterested witnesses. *Reeves*, 530 U.S. at 151. Indeed, since the standard for summary judgment mirrors that for judgment as a matter of law, the court may not make credibility judgments or weigh evidence. *Id.* at 150-151; *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). In particular, the court may not give credence to evidence from defendants' interested witnesses and such evidence may not form the basis for the grant of summary judgment. *Anderson*, 477 U.S. at 250; *Reeves*, 530 U.S. at 150-151. Summary judgment should not be granted based upon Defendant's use of testimony of current employees who are implicated in retaliation against Ms. McKown, as inherent credibility issues provide grounds for a reasonable jury to find pretext.

### D.    Suspicious timing: Edgerton fired McKown the first chance he got.

After being repeatedly reminded of Ms. McKown's protected complaint, Edgerton fired her the first chance he got. Contrary to Defendant's argument, McKown's protected complaint is not required to be within any particular temporal proximity to her termination to overcome Defendant's Motion for Summary Judgment.  "The mere passage of time is not legally conclusive proof against retaliation." *Robinson v. Southeastern Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 894 (3d Cir.1993); *see also Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828-30 (7th Cir. 2014) (rejecting timing-based rules at the pleadings stage and collecting cases); *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009-10 (7th Cir.2000) ("[o]f course, the fact that a year passed between [employee's] protected expression and her termination does not mean that she cannot prove that retaliation caused her discharge"); *Malin*, 762 F.3d at 559 (7th Cir. 2014).

Rather, suspicious timing is one of the many tools an employee can use to create an inference of retaliation.  Here, the timing between Ms. McKown's complaint and her termination is suspicious: (1) because Edgerton fired her the first chance he got; and (2) because Edgerton was continually reminded of her complaint up until he made his decision.

In *Owens v. Chicago Bd. of Trustees*, the Seventh Circuit found that ambiguous comments, though made months before the termination by the decision-maker, could still support an inference of retaliation, as "[i]t may take time for even a determined supervisor to undermine an employee's standing. *Owens. V. Chicago Bd. of Trustees*, 867 F.3d 814, 816 (7th Cir. 2017). Here, Edgerton had no choice but to wait several months before he could undermine Ms. McKown. As Defendant noted in its Brief, the timing of Ms. McKown's contract renewal review was preset; Edgerton had no control over it. [Document 35 at 21, citing McKown Deposition Ex. 9.] McKown was not an at-will employee who would be fired at any time.  Edgerton's first opportunity to get rid of her was her 2016 contract renewal review. [McKown Ex. 2 (Edgerton Dep. at 13:1-18); Document 35 at 21.]  That is exactly when he got rid of her. A reasonable jury could find it suspicious that Edgerton got rid of Ms. McKown at his first opportunity after her complaint and could infer retaliation.

Defendant wants the Court consider Ms. McKown's September 2015 complaint and the April 29, 2016 non-renewal in a vacuum. Defendant does not even mention Whitmore's IX complaint in its brief.  Dr. Whitmore's complaint is undeniably relevant: (1) she filed it because she thought Edgerton was retaliating against Ms. McKown for her protected complaints; and (2) the investigation into it served as a consistent reminder of Ms. McKown's complaint all the way up until nine days before Edgerton made his decision.  Defendant also ignores Ms. McKown's intervening EEOC Charge, probably because Edgerton falsely claims he did not know about it.

When Dr. Whitmore's complaint, the investigation thereabout, and Ms. McKown's EEOC Charge are taken into account, a continuum emerges. Indeed, in cases where a longer time interval exists between protected conduct and adverse action, a plaintiff may utilize circumstantial evidence to provide a "bridge" between the protected conduct and the adverse action.  *Malin*, 762 F.3d at 561. There is such a "bridge" in this case:

- Edgerton heard Ms. McKown's protected complaint on September 2, 2015;

- He commented that he could not believe she made the complaint and that he was looking forward to reviewing her during her next contract renewal review;

- He knew about Ms. McKown's September 30, 2015 meeting with HR about her complaint;

- He knew that Ms. McKown filed an EEOC Charge in December 2015 (despite lying about it later at his deposition);

- He learned Dr. Whitmore filed a Title IX complaint against him on February 13, 2016, alleging that he was retaliating against Ms. McKown based on her complaint;

- Patterson sent him a letter about Dr. Whitmore's Title IX complaint;

- After that, Patterson spoke to him about Dr. Whitmore's Title IX complaint;

- He then received an email from Patterson asking for more documents about Dr. Whitmore's Title IX complaint;

- Patterson also interviewed him about Dr. Whitmore's Title IX complaint;

- On February 29, 2016, Bauman emailed Edgerton about Dr. Whitmore's Title IX complaint; and, finally,

- On April 20, 2016, nine days before he decided not to renew Ms. McKown's contract, Patterson emailed Edgerton her report, reiterating Ms. McKown's complaint.

[*See supra* pp. 6-9.] A jury could conclude that Ms. McKown's complaints were fresh on Edgerton's mind when he made the decision to terminate her and that he was motivated by retaliatory animus. After all, it was Edgerton's first chance to fire Ms. McKown since her complaint, and he had been continually reminded of the complaint since it happened. As such, Defendant's Motion should be denied.

## VI.    CONCLUSION

Ms. McKown has presented sufficient evidence for a reasonable jury to determine Edgerton retaliated against her when it terminated her:

- The complaint Ms. McKown made was to Edgerton about Edgerton.

- The complaint was made in front of Edgerton's peers.

- Edgerton was shocked by the complaint.

- At deposition, Edgerton admitted to being frustrated by Ms. McKown's complaint.

- He told his colleagues that he could not believe Ms. McKown had made the complaint about him and that he was looking forward to deciding her upcoming contract renewal review.

- Edgerton knew that Ms. McKown filed an EEOC Charge alleging that he discriminated against her because of her age, sex, and religious beliefs.

- At deposition, Edgerton lied about his knowledge of Ms. McKown's EEOC Charge.

- Dr. Whitmore filed a IX complaint against Edgerton alleging that he retaliated against Ms. McKown, resulting in an investigation that continually reminded him of McKown's complaint.

- Edgerton was reminded of her complaint just nine days before he made his decision to terminate Ms. McKown.

23

- Edgerton fired Ms. McKown at his first opportunity since her complaint: her 2016 review.

- Four years prior, when the review committees' recommendations were not as favorable but she had not complained, Edgerton renewed Ms. McKown's contract.

- Edgerton contradicted himself during his deposition when testifying about whether he believed Ms. McKown was meeting expectations at the time of her termination.

- Five of seven review committee members, including the Director of the School of Journalism, concluded that Ms. McKown was meeting expectations and that her contract should have been renewed.

Edgerton was frustrated by Ms. McKown's complaint. He was going to get back at her for it. The first chance he got, that is exactly what he did.  The Court should deny Defendant's Motion and allow Ms. McKown's case to proceed to a jury.


Respectfully submitted,

*s/ Spenser G. Benge*
Meghan U. Lehner, #25899-49
Spenser G. Benge, #33955-48
CLEVELAND LEHNER CASSIDY
8250 Haverstick Road, Suite 235
Indianapolis, IN 46240
Telephone:      (317) 388-5424
Facsimile:      (317) 947-1863
Email:          meghan@clcattorneys.com
                spenser@clcattorneys.com

Attorneys for Plaintiff
Loni McKown

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 14, 2018, a copy of the foregoing document was filed with the Court via its Electronic Case Filing ("ECF") system.  Service of this filing will be made on all counsel of record by operation of the Court's ECF system.  Parties may access this filing through the Court's ECF system.

*s/ Spenser G. Benge*
Spenser G. Benge