UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LONI SMITH MCKOWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-04659-JRS-MJD |
| | ) | |
| BUTLER UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**Order on Defendant's Motion for Summary Judgment**

Plaintiff Loni Smith McKown alleges that her former employer, Defendant Butler University, declined to renew her employment contract in retaliation for her protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* Butler moves for summary judgment (ECF No. 34), and that motion is now fully briefed and ripe for decision. No reasonable jury could find that an unlawful retaliatory motive caused McKown's nonrenewal, so Butler's motion is **granted**.

## I. Legal Standard

"A district court properly grants summary judgment where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019). In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). However, the district court

1

must also view the evidence "through the prism of the substantive evidentiary bur-den," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986), and does not draw "inferences that are supported by only speculation or conjecture," *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).

## II. Background

After a distinguished career as a journalist at the *Indianapolis News*, the *Indian-apolis Star*, and WISH-TV, Plaintiff Loni Smith McKown joined the faculty of Butler University's Eugene S. Pulliam School of Journalism (then known simply as the "De-partment of Journalism") as an adjunct professor in 2009. (McKown Dep. 7:18–13:16, ECF No. 37-1 at 7–13; ECF No. 35-1 at 36.) The following year, McKown received a one-year appointment as a full-time instructor and faculty adviser to *The Butler Col-legian*, Butler's student newspaper. (ECF No. 35-1 at 37.) In 2011, she entered a two-year contract to serve as a full-time, non-tenure track, professional-in-practice faculty member. (ECF No. 35-1 at 38.) McKown's responsibilities comprised teaching (nine credits per semester, constituting 65 percent of her responsibilities), service (in-cluding advising the *Collegian*, representing 20 percent of her responsibilities), and professional activity (making up the remaining 15 percent of her responsibilities). (*Id.*)

In 2013, McKown's contract was up for renewal. As part of the renewal process, the faculty member under review prepares a dossier for submission to a departmental committee and a professional standards committee. (Edgerton Dep. 15:8–21, ECF No. 37-2 at 15.) The departmental committee reviews the dossier, determines

whether the faculty member met expectations in the relevant categories—in McKown's case, teaching, service, and professional activity—and makes a recommendation for renewal or non-renewal. That recommendation letter is then placed in the dossier and passed along to the professional standards committee. The professional standards committee likewise reviews the dossier and the letter from the departmental committee and makes its own determination whether the faculty member met expectations in each of the relevant categories. The professional standards committee adds its own letter to the dossier, which is then passed along to the dean—in McKown's case, Dean Gary Edgerton—to make a final renewal decision. (Edgerton Dep. 26:24–27:2, ECF No. 37-2 at 26–27.)

McKown's 2013 departmental committee, consisting of three members of Butler's journalism faculty, split two-to-one on whether McKown should be renewed for three years or just one year. Dr. Nancy Whitmore, then-Director of the School of Journalism, and Dr. Kwadwo Anokwa "strongly recommend[ed]" a three-year renewal. (ECF No. 35-1 at 44.) Drs. Whitmore and Anokwa found that McKown's teaching exceeded expectations, focusing on her curriculum development and positive comments and letters from students and recent alumni. (ECF No. 35-1 at 40.) Drs. Whitmore and Anokwa also found that McKown's service exceeded expectations, noting her dedication to the *Collegian* and the various awards and accolades the paper earned under her watch. (ECF No. 35-1 at 43.) Finally, Drs. Whitmore and Anokwa found that McKown met expectations for professional activity. (ECF No. 35-1 at 42.)

Dr. Margaretha Geertsema-Sligh, on the other hand, recommended a one-year re-newal, citing relatively low student evaluation scores and negative student com-ments. Dr. Geertsema-Sligh noted that McKown's evaluation scores "between 2.1 and 4.3" were acceptable but higher scores should be expected given McKown's small class sizes. (ECF No. 35-1 at 45.) Dr. Geertsema-Sligh further observed that McKown received "overwhelmingly negative qualitative student comments" on her teaching, "which accounts for 65 percent of her responsibilities," and that those com-ments had not improved over McKown's time at Butler. (ECF No. 35-1 at 45.) Stu-dents commented that McKown "made me hate journalism," "killed my desire for journalism," and "turned me away from journalism"; that McKown "makes people run away"; that her expectations are "unreasonable," "too much," "overwhelming," "excessive," "intense," "impossible," and "absolutely ridiculous"; that she "puts stu-dents and their work down"; and that she is "degrading to students," "unhelpful," "demeaning," "rude," "arrogant," and "hurtful." (ECF No. 35-1 at 45–46.) Dr. Geertsema-Sligh found that McKown met expectations for service and professional activity, but ultimately recommended a one-year renewal due to the negative student comments. (ECF No. 35-1 at 46.)

The departmental committee's letters were included in McKown's dossier and for-warded to the College of Communication's professional standards committee. (ECF No. 35-1 at 47.) (Organizationally, the School of Journalism was part of Butler's Col-lege of Communication.) The professional standards committee, consisting of five faculty members, "unanimously agreed that [McKown] did not meet . . . expectations

across all three areas of teaching, service and professional activity." (ECF No. 35-1 at 47.) Like Dr. Geertsema-Sligh, the professional standards committee was "especially concerned by the negative student comments in light of the fact that 65% of Ms. McKown's appointment is based on her teaching." (ECF No. 35-1 at 49.)

McKown's dossier—containing the letters from both committees—was ultimately forwarded to Dr. Gary Edgerton, who served as dean of Butler's College of Communication beginning in 2012. On March 11, 2013, Edgerton wrote to Butler's Provost, Dr. Kathryn Morris, recommending a one-year renewal for McKown. (ECF No. 37-23 at 1.) Edgerton wrote, "Seeing such widely diverse appraisals of a faculty member's performance is indeed unique in my more than 25 years of evaluating non-tenure track and tenure-track faculty members . . . ." (ECF No. 37-23 at 2.) Edgerton found that McKown had "improved as a teacher since fall 2010" when she received her lowest student evaluation scores and "an unusually high number of open-ended criticisms[.]" (ECF No. 37-23 at 2.) In discussing McKown's negative student comments, Edgerton observed that at the time "McKown [was] still relatively new to university teaching. It is common that new teachers—whether coming to academe from graduate school or in Professor McKown's case, a profession such as journalism—to [sic] sometimes misread issues such as the expected and acceptable workload . . . or how best to provide constructive criticism to college-aged students." (ECF No. 37-23 at 4.) He concluded, "All the concerns that students have identified in Professor McKown's classes are fixable. They just need timely and systematic attention." (ECF

No. 37-23 at 5.)  Edgerton noted that McKown's only previous review had "down-play[ed] the negative student comments" such that McKown "received mixed signals about the required urgency needed to address the student concerns[.]"  (ECF No. 37-23 at 7.) As Dean Edgerton recommended, McKown's contract was renewed for one year.

McKown's contract was again up for renewal in 2014, and she again prepared a dossier for submission to a departmental committee, a professional standards committee, and Dean Edgerton.  (ECF No. 35-1 at 57; ECF No. 35-2 at 19–30.)   McKown's departmental committee, consisting of Dr. Whitmore, Dr. Geertsema-Sligh, and Dr. Christine Taylor, voted unanimously to "strongly recommend" a three-year reappointment.   (ECF No. 35-2 at 19, 22.)   The departmental committee found that McKown's teaching exceeded expectations for reappointment, noting "significantly improved student assessments," including both improved student evaluation scores and "very positive" student comments. (ECF No. 35-2 at 20.) The professional standards committee likewise found that McKown met expectations in teaching, service, and professional activity and voted unanimously to recommend renewal.  (ECF No. 35-2 at 25.)  The committee found that McKown "demonstrated significant progress in her teaching"—her student evaluation scores rose to within the College of Communication's averages and student comments were "much more positive in nature." (ECF No. 35-2 at 24.)

In reviewing the committee's letters and McKown's dossier, Dean Edgerton found that McKown had "put in the necessary time and effort to significantly improve her

classroom performance" such that she "easily [met] expectations in teaching." (ECF No. 35-2 at 29.)  Edgerton also acknowledged McKown's "enormous time commitment" to advising the *Collegian*, which had received "literally dozens" of awards and recognitions under McKown.   (ECF No. 35-2 at 29.)  Edgerton concluded by "applaud[ing]" McKown for her "dramatic improvement" in teaching, service, and professional activity. (ECF No. 35-2 at 30.) On March 24, 2014, Edgerton recommended a three-year contract renewal, and in September 2014, McKown was reappointed for three years.  (ECF No. 35-2 at 30; ECF No. 35-1 at 58.)

Edgerton conducted McKown's annual performance review in April 2015, giving McKown an overall rating of "above expectations" for calendar-year 2014.  While Edgerton praised McKown as "energetic" and "committed," he also noted that her student evaluation scores had fallen to "at or below [average]" in the fall of 2014 and that student comments were "decidedly mixed."  (ECF No. 35-2 at 35.)  Specifically, Edgerton observed that "many of the critiques that existed prior to 2013 resurfaced, clustering around having unrealistic workloads and performance expectations and being harsh, unkind, and discouraging to students in providing them with feedback on their work." (ECF No. 35-2 at 5.)  He emphasized, "It is of the utmost importance that Professor McKown does not lose ground on the improvements that she made in the classroom from 2011 to 2013."  (ECF No. 35-2 at 5.)

On August 12, 2015, McKown received an email from Butler's president about enrollment projections and salary changes.  The next day, she forwarded the email to the *Collegian*'s student editor-in-chief and two managing editors.  (McKown Dep.

7

97:5–98:15, ECF No. 37-1 at 97–98.)  In forwarding the president's email, McKown noted that she did not know whether it had been sent to students.  (McKown Dep. 98:4–6, ECF No. 37-1 at 98.)  On August 19, 2015, McKown received an email from Dean Edgerton about budget and enrollment shortfalls.  (ECF No. 35-1 at 59.)  The email, sent to the College of Communication's faculty and staff, contained a footer that read:

> **CONFIDENTIALITY NOTICE:**  *This email, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, or distribution is prohibited.  If you received this email and are not the intended recipient, please inform the sender by email reply and destroy all copies of the original message.*

(ECF No. 35-1 at 60.)  McKown forwarded the email to the *Collegian*'s editor-in-chief. (McKown Dep. 95:12–96:15, ECF No. 37-1 at 95–96; ECF No. 35-1 at 59.)

Two days later, one of the *Collegian*'s student-reporters emailed Edgerton about Butler's low enrollment and the specific budget cuts mentioned in Edgerton's August 19th email to faculty and staff.  (ECF No. 35-4 at 9.)  Edgerton emailed McKown and Dr. Whitmore to ask how the student obtained the email.  (ECF No. 35-4 at 8.) McKown testifies that when Edgerton asked her about the forwarded email, she "immediately . . . apologized" and told Edgerton, "It will never happen again."  (McKown Dep. 96:13–15, ECF No. 37-1 at 96.)

After McKown admitted to forwarding the email, Dr. Edgerton met with Dr. Whitmore and Assistant Dean Suzanne Reading; all three agreed that McKown should be removed from her position as adviser.  (Edgerton Decl. ¶ 7, ECF No. 35-4

at 2; McKown Dep. 125:10–13, ECF No. 37-1 at 125.)  On Dr. Whitmore's recommen-dation, Edgerton selected Marc Allen to serve as interim adviser to the *Collegian* to succeed McKown.  (Edgerton Decl. ¶ 8, ECF No. 35-4 at 2.)  Allen accepted the role on August 25, 2015.  (Edgerton Decl. ¶ 8.)

Two days later, Edgerton emailed Provost Morris to inform her of McKown's re-moval.  (Edgerton Decl. ¶ 9, ECF No. 35-4 at 2.)  Edgerton explained that McKown "made an ethical mistake" and "went beyond what is acceptable for her stated duties" as adviser.  (ECF No. 35-4 at 11.)  Edgerton noted that McKown was "trying to argue her case to stay on," but "from [his] perspective, it [was] not negotiable."  (ECF No. 35-4 at 11.)  Edgerton further told Morris that he would give McKown "the option to resign so that the particulars of what she did need not be made public."  (ECF No. 35-4 at 11.)

Dr. Whitmore met with McKown one-on-one to convey to McKown that Dr. Edger-ton wanted her to step down from the adviser position for forwarding the email.  (McKown Dep. 118:22–119:3, ECF No. 37-1 at 118–119.)  McKown refused.  Edgerton, Whitmore, and Reading then met with McKown on September 2, 2015, to discuss her removal.  (McKown Dep. 118:12–21, ECF No. 37-1 at 118.)  At the meeting, McKown brought a written statement; she asked to read it uninterrupted and did so.  (McKown Dep. 121:4–6, ECF No. 37-1 at 121.)

In her statement, McKown denied having tried to control the content of the *Colle-gian* and distinguished forwarding "news tips" from directing content.  (ECF No. 35-1 at 62.)  She added, "Most of the news tips [she had] forwarded over the years [were]

ignored because students came up with *better* story ideas." (*Id.*) Acknowledging that she forwarded the email, McKown stated in her defense:

> I inadvertently forwarded an email from the dean of the College of Communication that had a confidentiality notice underneath his signature.
>
> I acknowledged that I had no idea the notice was even at the bottom – had never noticed before and remain unsure when he started using it. It wasn't until his question about how a Collegian reporter learned the information and had requested an interview that I saw the confidentiality notice.
>
> Furthermore, the information in the email related to public knowledge at the university: Enrollment lower than projected means belt tightening by all university departments and offices to help manage a smaller budget.
>
> I accepted responsibility and apologized. This was not the Pentagon Papers I forwarded, not the scope of diplomatic cables dumped by WikiLeaks, not the classified information released by Edward Snowden.
>
> In short, this is a minor offense – and certainly not a dismissible offense.

(*Id.*)

McKown alleged that the request for her resignation was "a continuation of a hostile work environment. The dean's reaction is indicative of a continuance of hostility of Ph.D.'s toward professional practice and untenured faculty." McKown continued, "Furthermore, since the dean joined the university three years ago, I have experienced increased and relentless examination under a microscope because of my position as Collegian adviser. The dean's reaction to this minor offense is indicative that he was looking for an excuse for a petty offense – but I am additionally concerned about a bias on his part against women, or someone my age, or against Jews." (ECF No. 35-1 at 63.)

10

After voicing her "concern[ ]" about Edgerton's purported sex-, age-, and religion-based bias, McKown immediately turned to the "repercussions" that would result "[i]f the dean chooses to pursue the effort to remove [McKown] from the position – or to fire [her] – without just cause[.]":

I will request an official investigation by the national College Media Advisers.  CMA will surely publicly censure Butler University for the following:

- The often-repeated phrase from the dean regarding me as being "too investigative" and my students as being "too aggressive." Give the students some credit for putting into practice at Collegian what they are taught in the classroom and experiential learning opportunities via journalism classes.

- The mistaken impression – also often repeated by the dean – that I am perceived to be like the Wizard of Oz behind a curtain controlling Collegian content and coverage of Butler.  They will talk to every editor in chief I advised over the past five years to learn this: The students are smart.  They're intellectually curious.  And they are aware it's their money paying for the amenities and services – and sometime lack thereof – during their time at Butler. They decide the content and the coverage.

- The fact that the dean tried, many times, to quash stories being openly and transparently pursued by Collegian staff – including most notably "Red Ink" about the Collegian's financial problems ("Don't bite the hand that feeds you") and the story about the new Desmond Tutu Center and its new director, both of which won state, regional and national awards, the latter a prestigious Investigative Editors and Reporters Award (tying with Northwestern University's Medill Justice Project).

- And the fact that the dean has already lined up my replacement as adviser to the Butler Collegian – a member of Butler University's public relations department.

I will request investigation by the national Society of Professional Journalists.  SPJ will surely publicly censure Butler University for the same points listed above.

> I will request columns by national media blogger Jim Romanesko and by faculty of the Poynter Institute, which trains professional journalists and supports educators dedicated to training news media students, regarding the points listed above.
>
> And I will request legal assistance from the national Student Press Law Center.
>
> Last, but not least[,] I anticipate reaction from leadership and staff members of The Butler Collegian. While I will not initiate the conversation, I will honestly answer any questions they ask me.

(ECF No. 35-1 at 63–64.)

McKown then listed "[w]hat [she] bring[s]" to the *Collegian* and Butler, noting her connections to media members and a donor. (ECF No. 35-1 at 64.) McKown's uninterrupted statement took "10, 15 minutes" such that she "had the floor for a while." (Whitmore Dep. 73:15–18, ECF No. 37-3 at 73.) When McKown finished reading her statement, the other attendees had "nothing to add." (McKown Dep. 121:6, ECF No. 37-1 at 121.) In closing, she told them that she would be out of town for the holiday weekend and asked them to "please think about it before any final decision." (McKown Dep. 121:6–10, ECF No. 37-1 at 121.) But the decision had already been made; as McKown knew, her replacement had been selected a week earlier.

Dr. Whitmore testifies that "everybody was shocked [by] the things that she said"—shocked "because she was facing this review process coming up and . . . this is just not how you do things in academics." (Whitmore Dep. 48:20–22, 49:23–50:1, ECF No. 37-3 at 48–50.) Dr. Whitmore elaborated,

> I felt like the administration had trouble with the *Collegian*[,] and I think they looked at Loni as being the one that was – like if they changed her, then the *Collegian* would not be as investigative or tough or, you know, it would be different. So when she forwarded the letter or the

12

> email, you know, I felt like, you know, you were sort of on thin ice before.
> Now it's like wow, you know.  And then when she read the letter, it was
> like, oh, my.

(Whitmore Dep. 70:20–71:5.)  McKown seemed to say, "you better watch it because

. . . this could go public," which was "definitely shocking" to those at the meeting.

(Whitmore Dep. 72:23–73:10, ECF No. 37-3 at 72–73.)  After McKown left the meet-

ing, Dr. Edgerton said, "I can't believe she did this.  She's coming up for renewal.  A

part of me is looking forward to reviewing her."  (Whitmore Dep. 71:9–15, ECF No.

37–3 at 71.)

Two days later, on September 4, 2015, Dr. Edgerton wrote to McKown to "reiterate

that as of September 2, 2015," she was no longer the *Collegian*'s adviser.  (ECF No.

35-4 at 13.)  (McKown otherwise continued her employment as professional practice

faculty member.)  Dr. Edgerton and other Butler administrators began to experience

McKown's threatened "repercussions" almost immediately.  McKown informed the

president of the College Media Advisers that she had been removed from her position

as adviser to the *Collegian*, and the CMA initiated an investigation.  (McKown Dep.

174:14–175:8, ECF No. 37-1 at 174–75.)  McKown informed a reporter at the *Indian-

apolis Business Journal* (*IBJ*) that she had been removed from the *Collegian*, and the

*IBJ* ran an article.  (McKown Dep. 173:13–174:11, ECF No. 37-1 at 173–74.)

Dr. Edgerton received an email from an *IBJ* reporter requesting comment on Sep-

tember 11, 2015; he forwarded the email to Provost Morris and Matt Mindrum, But-

ler's Vice President of Marketing and Communication.  (ECF No. 35-2 at 44–45.)

Edgerton and Mindrum exchanged several emails in the same thread over the next

few days.  (ECF No. 35-2 at 39–44.)  In response to the *IBJ* article and a blog post apparently entitled, "Freedom of the Press Under Fire at Butler University," Edgerton complained to Mindrum,

> Loni McKown is using her contacts to orchestrate this framing of the story.  There are crucial misrepresentations and untruths throughout this blog.  For someone who claims she has no idea why she was dismissed, she somehow seems to know the facts in her written statement with parts of it shared here. . . .  If you look through the statement she wrote in response to being dismissed as Collegian editor [sic], it's reasonable to believe this full court press will persist.  I don't believe litigating this case in public makes any sense, but isn't there some action we can take through HR or some other avenue?

(Edgerton Dep. Ex. 10, ECF No. 35-2 at 43.)

In a subsequent email, Edgerton sent a link to an announcement of McKown's formal request for a CMA investigation.  (Edgerton Dep. Ex. 10, ECF No. 35-2 at 42.) Edgerton complained that McKown, "has taken an employment issue outside of the context of Butler and turned it into a free speech issue.  She wrote down nearly two pages of threats and now she's following along on that blueprint in the hopes of being reinstated.  I believe an institutional response in person or public or probably both needs to be made."  (Edgerton Dep. Ex. 10, ECF No. 35-2 at 42.)

The following day, Edgerton sent another email, expressing concerns about "how all the outside chatter is affecting the faculty on campus."  (Edgerton Dep. Ex. 10, ECF No. 35-2 at 40.)  He noted that he and Provost Morris "talked on the phone Thursday night about the temperature in my college, and as best as I could tell then, all was fine.  I have since had one conversation on Friday and received another e-mail yesterday about the need to calm the waters."  (Edgerton Dep. Ex. 10, ECF No.

35-2 at 40.)  Edgerton continued, "Loni McKown and surrogates have come out with guns blazing . . . .  Loni is utilizing her surrogates to malign me, the School of Journalism, the college, and Butler.  She is also an employee at Butler.  At some point, that's got to become an HR matter.  She has already refused to meet with HR to explain how I've shown bias towards her because she's a woman, her age, and her Jewish heritage."  (Edgerton Dep. Ex. 10, ECF No. 35-2 at 41.)

In another email the following day, Edgerton again emphasized the need for a human-resources response to McKown's public relations campaign:

> [B]ecause of Loni's unique skill set and network of contacts, she's not going to stop responding public[ly], but she is minimizing what she does internally where she has less influence and is more accountable to why she was let go as advisor.  We have to engage her more on the local level through HR because this is first and foremost a personnel matter.

> Loni's public media campaign has currently insulated her at Butler, pending whatever institutional internal/external response we marshal. She thinks she is untouchable and is acting like she can't be disciplined. She has also made written threats and is following through on them. . . . .

> [W]e probably need to develop a coordinated internal/external institutional response.  What we can do on the ground through HR channels determines what we say public[ly]. . . . .

> The CMA posting has also made it clear that Loni McKown's ultimate goal is reinstatement as *Collegian* advisor.  The quicker we dispose of this notion, the better.  Her intention is to bring the house down if she doesn't get her way.  There has [sic] to be safeguards put in place to limit whatever damage she can do to the institution in the future.

(Edgerton Dep. Ex. 10, ECF No. 35-2 at 39.)

Various overlapping proceedings—investigations, grievances, and reviews—ensued in the following months.

15

Around September 30, 2015, McKown met with an HR employee to discuss her allegation that Edgerton harbored sex, age, and religion biases. (McKown Dep. 139:3–8, ECF No. 37-1 at 139.) On October 2, 2015, Edgerton received an email informing him that McKown met with HR and could not provide any evidence of discrimination and that the matter was therefore closed. (Edgerton Dep. Ex. 9, ECF No. 35-2 at 37.)

McKown lodged an internal grievance against Edgerton on November 27, 2015, complaining that Edgerton's decision to remove her as adviser was "rash and unexplained," "sudden and arbitrary," procedurally inadequate, and "an attempt to limit student freedom of expression, freedom of student press, and academic freedom at Butler University." (ECF No. 35-4 at 15–19.) McKown did not allege that her removal was due to her membership in a statutorily protected class or engagement in statutorily protected activity; she mentioned only that she "met twice" with HR and "was told there was no proof of discrimination as a member of a protected class." (ECF No. 35-4 at 18.)

On December 18, 2015, McKown filed an EEOC charge alleging that her removal from her post as faculty adviser to the *Collegian* was the result of age-, sex-, and religion-based discrimination. (ECF No. 37-24.) On January 12, 2016, Edgerton submitted Butler's response to McKown's internal grievance. He acknowledged McKown's EEOC charge and noted that Butler would not comment on the allegations except to say that "during the course of [HR employees'] investigation, Ms. McKown admitted that she had no evidence, nor any proof of discrimination and that her claim

was based on her speculation." (ECF No. 37-27 at 4.) Edgerton offered the same reasons for McKown's removal to the grievance committee as he had previously offered to Provost Morris: McKown forwarded the email and her reaction "made it clear to [Edgerton] that [McKown] still didn't recognize how she was inserting herself into the news collection process of the *Collegian* rather than just acting as an adviser to it." (ECF No. 37-27 at 3.) Edgerton added that the "incident confirmed to [him] a broader pattern of behavior on Ms. McKown's part as adviser of *The Butler Collegian*," that McKown had subsequently "admitted in statements to the press that she has forwarded several such news tips to *Collegian* staffers over the years," and that she "has never acknowledged during any meeting or conversation that forwarding a confidential, internal correspondence was outside her purview as *Collegian* adviser." (ECF No. 37-27 at 4.)

Around the same time, McKown nominated herself to replace Whitmore as director of the School of Journalism. On February 9, 2016, Edgerton emailed the journalism faculty inform them that Dr. Geertsema-Sligh was the only eligible candidate for director. (McKown Dep. Ex. 27, ECF No. 35-1 at 85.) Edgerton cited the College of Communication's policy that "[o]nly tenured members of the faculty shall be eligible to serve as administrators of academic units" unless "the academic unit does not have a tenured faculty member who is available or able to serve[.]" (*Id.*) Because Dr. Geertsema-Sligh was tenured and available to serve as director, the College of Communication's bylaws precluded McKown—who was not tenured—from filling the director position. On February 13, 2016, concerned about the circumstances of

17

McKown's elimination from consideration for the director position, Dr. Whitmore lodged a Title IX retaliation complaint against Edgerton. (ECF No. 37-15.) Edgerton was notified of the complaint and interviewed by Butler's Title IX coordinator. (Patterson Dep. 19:1–5, ECF No. 37-4 at 19.)

On February 18, 2016, Butler submitted its opposition to McKown's EEOC charge of discrimination. (ECF No. 37-9 at 1.) Butler took the same position Edgerton had previously taken in his explanations to both Provost Morris and the grievance committee: that McKown had forwarded a "clearly marked confidential email regarding Butler's financials to students," and that Edgerton removed McKown as the *Collegian*'s adviser because McKown "had violated her ethical responsibilities as a journalist [and] her professional responsibilities as a member of the Butler faculty, and because her actions illuminated a broader pattern of improperly influencing the *Collegian*." (ECF No. 37-9 at 1.)

McKown's contract was again up for renewal in 2016. On January 19, 2016, McKown submitted her dossier to Dean Edgerton for distribution to the departmental and professional standards committees. McKown's departmental committee, consisting of Drs. Whitmore, Anokwa, and Kenneth Creech, voted unanimously to recommend reappointment to a three-year term. (ECF No. 37-19.) The committee found that McKown met expectations in teaching, but also "found that after reviewing several years of student evaluations and comments, a trend has developed that needs to be seriously addressed." (ECF No. 37-19 at 3.) There was no further elaboration on

the nature of the "trend."  The committee further found that McKown exceeded ex-
pectations in professional activity and met expectations for service, though it noted
that "[m]oving forward, she will need to reevaluate her service activities now that she
no longer serves" as adviser to the *Collegian*.  (ECF No. 37-19 at 2–4.)

    The professional standards committee split 2-2 on whether to recommend re-
newal.  (ECF No. 37-18 at 4.)  Three of its four members found that McKown failed
to meet expectations in teaching.  (ECF No. 37-18 at 3.)  The committee found that
student comments "followed a continuing pattern of being extraordinarily mixed,"
comparing one student's report that "[t]his is a tough class, but the amount I learned
and improved was substantial," with another's observation that "[t]his class is the
reason that so many people have dropped Journalism and it makes me not want to
be a journalist."  (ECF No. 37-18 at 2.)  The committee expressed "greater concern"
about "the number of narrative comments where students worry about their own well
being and mental health," citing examples.  (ECF No. 37-18 at 2.)  The committee was
"trouble[ed]" that McKown "was not able to develop more positive or fulfilling rela-
tionships with students" given her class sizes of between eight and fifteen students,
"as compared to the more common eighteen to twenty-five enrollment numbers found
across the college and university."  (ECF No. 37-18 at 2.)  The committee also found
that McKown met expectations in service—based in part on her advising responsibil-
ities for the *Collegian*—and split 2-2 on whether she met or exceeded expectations in
professional activity.  (ECF No. 37-18 at 3.)

On March 18, 2016, Butler's grievance committee returned its decision on McKown's internal grievance, ultimately finding that the process for McKown's removal from the *Collegian* was "fair and impartial." (ECF No. 35-4 at 25.) McKown amended her EEOC charge on March 30, 2016, to allege that her removal from consideration for the directorship was the result of unlawful retaliation. (ECF No. 37-25.) On April 20, 2016, Butler's Title IX coordinator determined that Edgerton's removal of McKown from consideration for the directorship was not retaliation, but rather the result of McKown's ineligibility for the position under the College of Communication's bylaws. (ECF No. 37-17 at 2–5.)

On April 29, 2016, Edgerton submitted his recommendation not to renew McKown's contract. Edgerton noted that of the nine classes for which McKown received quantitative student evaluations during the review period, her scores for five of the classes were below average or significantly below average. (ECF No. 37-20 at 2.) He further observed that McKown's student comments were "as divided . . . as they have been in the past for her." (ECF No. 37-20 at 2.) Edgerton noted that "many of the same criticisms that existed prior to 2013 resurfaced, clustering around her assigning outsized workloads, having unrealistic performance expectations, and being harsh, unkind, and discouraging to students in providing them with feedback on their work." (ECF No. 37-20 at 2.) Echoing the professional standards committee's findings, Edgerton expressed concern for "the number of narrative comments where students worry about their own well being and mental health," citing several examples. (ECF No. 37-20 at 2.)

20

Edgerton recalled warnings he gave McKown in her 2013 renewal review and her 2014 performance review, noting that McKown was renewed for one year in 2013 "as an opportunity to show continued improvement," but that since then "McKown's problems in the classroom have resurfaced." (ECF No. 37-20 at 3.) In McKown's 2014 performance review, Edgerton "emphasized that 'It is of the utmost importance that Professor McKown does not lose ground on the improvements she made in the classroom from 2011 to 2013 [and] addressing these recurring concerns must be a top priority for 2015.'" (ECF No. 37-20 at 3.) In light of those opportunities and warnings, Edgerton took issue with McKown's and the departmental committee's "dismiss[al]" of the "perennial criticism of her 'tone and delivery'," which was "longstanding." (ECF No. 37-20.) Edgerton noted that the departmental committee did not name "the trend that needs to be seriously addressed," and that the committee's "remedy offered . . . duplicates the recommendation [the departmental committee] gave her [in 2013] and hasn't ameliorated these problems since." (ECF No. 37-20 at 3.) "A more definitive way forward needs to be adopted." (ECF No. 37-20 at 4.)

Edgerton observed that "McKown teaches less [sic] students than any other faculty member in the College of Communication," (ECF No. 37-20 at 4), which provides "a ripe opportunity for a professor to cultivate productive and healthy rapport with students." However, "this opportunity only works for a select number of students who are inspired to persevere and improve, while others are discouraged, tune out, and avoid taking another class with her. We have a responsibility to adequately address the needs of these students as well." (ECF No. 37-20 at 4.)

Edgerton concluded, "As of spring 2016, Professor McKown has been teaching [journalism] for six years.  She has been given direct and consistent feedback on her strengths as a teacher and what she needs to work on.  She has also had adequate time to make the necessary adjustments to 'maintain . . . . progress in a consistent and focused manner,' as called for by the [departmental committee]."  (ECF No. 37-20 at 4.)  He added that the examples of students dissatisfied with McKown's classes were "not aberrations" and concluded that McKown failed to meet expectations in teaching.  (ECF No. 37-20 at 5.)

Turning to service, Edgerton acknowledged "the continuing quality improvements at the *Collegian*," but found that "[b]ecause of her actions that led to [her] dismissal, Loni McKown does not meet expectation[s] in service[.]"  (ECF No. 37-20 at 5.)  Edgerton found that McKown met expectations in professional activity, but concluded that McKown's contract would not be renewed because she "does not meet expectations in teaching and service, which comprises 85% of her contractual workload obligations."  (ECF No. 37-20 at 6.)

Butler submitted additional responses to McKown's amended EEOC charges.  Regarding Edgerton's refusal to consider McKown for the directorship, Butler took the same position as Edgerton and the Title IX investigator had previously taken:  as a non-tenured professor, McKown was not eligible for the directorship under the College of Communication's bylaws.  (ECF No. 37-10 at 2–3.)  Regarding Butler's decision not to renew McKown's contract, Butler contended that McKown was not renewed due to low student evaluation scores, low enrollment in McKown's classes, negative

student comments, and McKown's actions that caused her removal as adviser to the *Collegian*. (ECF No. 37-11 at 1–5.)

McKown continued her employment at Butler until her contract expired after the spring semester of 2017. (Compl. ¶ 23, ECF No. 1 at 4.) McKown alleges that Butler declined to renew her contract in retaliation for her September 2, 2015, complaint that Edgerton harbored sex, age, and religious bias and for her December 2015 EEOC charge. Butler moves for summary judgment.

### III. Discussion

To prevail on a retaliation claim under Title VII or the ADEA, a plaintiff must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 566 (7th Cir. 2019) (quoting *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016)). Retaliation claims "require traditional but-for causation, not a lesser 'motivating factor' standard of causation." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1104 (7th Cir. 2013) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)). Here, "the appropriate question on summary judgment is simply: could a reasonable jury find based on *all* available evidence that a . . . retaliatory motive caused [McKown's] termination?" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 569 (7th Cir. 2017). Butler contends that the answer is no. McKown disagrees, pointing to Edgerton's statements, differences between Edgerton's treatment of her pre-complaint and post-complaint, the timing of Butler's non-renewal decision, and evidence of pretext. (Pl.'s Mem. at 12–23, ECF No. 36.)

The summary-judgment evidence here contains much pertaining to academic free-dom and freedom of speech. It also contains allegations in various non-EEOC pro-ceedings that Butler's decisions were unfair, arbitrary, procedurally deficient, hostile to non-tenured professors, and so on. It therefore bears emphasis that for purposes of this Title VII and ADEA retaliation case, at issue is not retaliation *tout court* but rather retaliation against conduct of the kind protected by those statutes: opposition to employment practices prohibited by those laws or participation in a proceeding arising under those laws. *See* 42 U.S.C. § 2000e–3(a) (Title VII); 29 U.S.C. § 623(d) (ADEA). Conduct unrelated to employment discrimination—for example, complaints that employment decisions were arbitrary, unwise, inimical to academic freedom, or hostile to non-tenured faculty—does not fall within the ambit of Title VII or the ADEA, and evidence of retaliation for such conduct will not forestall summary judg-ment.

## A. *Edgerton's Statements*

McKown cites two statements as evidence of Edgerton's retaliatory animus. In an email to other Butler administrators, Edgerton wrote, "Loni is utilizing her sur-rogates to malign me, the School of Journalism, the college, and Butler. She is also an employee at Butler. At some point, that's got to become an HR matter. She has already refused to meet with HR to explain how I've shown bias towards her because she's a woman, her age, and her Jewish heritage." (Edgerton Dep. Ex. 10, ECF No. 35-2 at 41.) And according to Whitmore, after McKown delivered her ten-to-fifteen-minute long statement, Edgerton said, "I can't believe she did this. She's coming up

for renewal.  A part of me is looking forward to reviewing her." (Whitmore Dep. 71:9–15, 73:15–18, ECF No. 37–3 at 71, 73.)

Statements that appear damning in isolation but benign in proper context do not preclude summary judgment.  *See Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 625 (7th Cir. 2002) ("When evaluating direct evidence in support of a plaintiff's position, we look at the context in which a statement was made."). In *Collins v. American Red Cross*, 715 F.3d 994, 998–99 (7th Cir. 2013), a report recommending the plaintiff's termination included a finding that the plaintiff "told others that [the employer] was out to get minorities."  The Seventh Circuit held that the statement did not support the plaintiff's retaliation claim because, when read in context, the "report was concerned with [the plaintiff] sowing racial tension in the office, not with her EEOC complaint."  *Id.*  Similarly, in *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713–14 (7th Cir. 2004), the court held that a manager's statement about "changing the 'complexion' of the department" did not support a claim of race discrimination where the "remark was made in the context of discussing the department's organization and ways to increase its efficiency."

Context is important here as well.  The four-sentence "refused to meet with HR" statement is excerpted from an eleven-paragraph email, which is itself part of a thread of seven emails exchanged over three days.  The preceding paragraphs of the relevant email principally address (1) the effect of media coverage of McKown's removal from the *Collegian* on faculty morale and (2) the media's framing of McKown's

removal as an attack on freedom of the press. In the immediately preceding paragraph, Edgerton seeks support from his colleagues for a "response . . . to counteract Loni McKown's misinformation campaign and turn this back into an employment rather than a free speech issue."

The theme recurs throughout the emails. The thread starts with Edgerton forwarding an email from an *IBJ* reporter seeking comment on McKown's removal from the *Collegian*. Above the forwarded email, Edgerton comments that he had "followed the talking points[.]" (Edgerton Dep. Ex. 10, ECF No. 35-2 at 43–44.) The emails that follow naturally focus on media coverage and public perception of McKown's removal, not on McKown's allegations of bias. Elsewhere in the thread, Edgerton complains that "Loni McKown has taken an employment issue outside of the context of Butler and turned it into a free speech issue," and he seeks an "institutional response" to "change[] the dynamics back to it being an employment issue." (Edgerton Dep. Ex. 10, ECF No. 35-2 at 42.) In response to the "refuses to meet with HR" email, Mindrum writes, "I understand there is a lingering concern about the employment/academic freedom/free speech issues and that you want to respond," but Mindrum was unsure how to do so "unless Claire gives us some flexibility on discussing employment issues given Loni's rampant misrepresentations." (Edgerton Dep. Ex. 10, ECF No. 35-2 at 40.) In this context, Edgerton's statement about McKown's "refus[al] to meet with HR" about her bias allegations forms part of his broader lament that McKown challenged her removal from the *Collegian* publicly rather than inter-

nally and that she framed the debate in terms of freedom of speech rather than employee discipline.  It therefore does not support an inference of unlawful, retaliatory motive.

Edgerton's post-meeting statement that he "[couldn't] believe she did this" and was "looking forward" to reviewing her must also be considered in context.  The statement followed a meeting at which McKown's supervisors had planned to discuss her removal from the *Collegian* and offer McKown the opportunity to resign as adviser so that the details of her "ethical lapse" would not go public.  The meeting evidently did not go as planned.  Instead, McKown delivered an uninterrupted, ten-to-fifteen-minute, prepared statement, which she began by revealing that she had forwarded other "news tips . . . over the years."  (McKown Dep. Ex. 18, ECF No. 35-1 at 62.)  McKown minimized her conduct by comparison with Edward Snowden, WikiLeaks, and the Pentagon Papers.  (*Id.*)  She complained of Edgerton's hostility toward untenured faculty and accused him of "try[ing], many times, to quash stories" in the *Collegian*.  (*Id.* at 63.)  McKown then refused to resign, threatened the "repercussions"—the bad press—that would follow if she were removed, touted her connections with the news media and a donor, and refused to accept her removal, instead insisting that Edgerton think about it over the weekend.  (*Id.*)  It therefore appears unlikely that Edgerton's "this" referred to McKown's single-line bias allegations and not to her three pages of remarkable admissions, accusations, threats, and defiance.  This conclusion is further supported by Whitmore's testimony that Edgerton's comment referred to McKown's full statement, by Reading's declaration that Edgerton was shocked by McKown's

27

threats to go to the media, (Reading Decl. ¶ 7, ECF No. 35-5 at 3), and by Edgerton's preoccupation with news coverage evident in his subsequent emails discussed above.

But even if a jury could reasonably find that Edgerton's "this" included McKown's bias allegations, retaliation for those particular allegations would not have been unlawful. The Seventh Circuit has "consistently held that an employee's insubordination toward supervisors and co-workers, even when engaged in a protected activity, is justification for termination." *Kahn v. U.S. Sec'y of Labor,* 64 F.3d 271, 279 (7th Cir. 1995); *see also Benes v. A.B. Data, Ltd.*, 724 F.3d 752, 753 (7th Cir. 2013) (holding that firing employee for conduct during EEOC mediation did not violate Title VII because the "prospect of being fired for an egregious violation of a mediator's protocols would not discourage a reasonable worker from making a charge"); *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 745 (7th Cir. 2010) ("participation doesn't insulate an employee from being discharged for conduct that, if it occurred outside an investigation, would warrant termination"); *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (holding that termination for raising discrimination complaints by "confront[ing] and antagoniz[ing]" supervisors in "inappropriate contexts in a way that was designed to force the company's hand or make it pay a price in reduced productivity, focus and morale" did not constitute unlawful retaliation); *cf. Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 569 (7th Cir. 2015) ("Employers cannot retaliate against employees who complain about violations of Title VII under the ruse that the employee was being 'disloyal' or 'insubordinate' by opposing the unlawful activity."). Given the context

28

and manner of McKown's allegations at the meeting—intermingled with insubordination and threats—Edgerton's comment does not appreciably support an inference of *unlawful* retaliation.

## B. Comparator Evidence

McKown contends that she is her own comparator because Edgerton treated her better in 2013, before she made her allegations, than he did after she made her allegations in September 2015. A would-be comparator need not be identical to the plaintiff, but must be similar with respect to the employment characteristics material to the case. *South v. Illinois Envtl. Prot. Agency*, 495 F.3d 747, 752–53 (7th Cir. 2007). Here, 2013 McKown was materially dissimilar from 2016 McKown, precluding meaningful comparison.

In 2013, McKown's departmental committee split on renewal and her professional standards committee voted against renewal. In recommending a one-year renewal, Edgerton noted that McKown was "still relatively new to university teaching," (ECF No. 37-23 at 4), and that McKown's only previous review had "downplay[ed] the negative student comments" such that McKown "received mixed signals about the required urgency needed to address the student concerns," (ECF No. 37-23 at 7). He concluded that McKown's shortcomings were "fixable" with "timely and systematic attention." (ECF No. 37-23 at 5.)

McKown evidently improved and received a three-year renewal. But by April 2015, Edgerton informed McKown that "many of the critiques that existed prior to 2013 resurfaced, clustering around having unrealistic workloads and performance

expectations and being harsh, unkind, and discouraging to students in providing them with feedback on their work." (ECF No. 37-8 at 1.)  Edgerton emphasized that "[i]t is of the utmost importance that Professor McKown does not lose ground on the improvements that she made in the classroom from 2011 to 2013." (ECF No. 37-8 at 1.)  Edgerton exhorted McKown to "make every effort" to be "constructive and supportive in her student criticisms" and reiterated that "addressing these concerns must be a top priority for 2015." (ECF No. 37-8 at 1.)

Thus, in 2013, McKown was a relatively new teacher who had not been provided clear warning that she needed to address students' concerns about her expectations and tone, but by 2016, McKown was no longer a new teacher and had received clear and specific warnings about her teaching in 2013 and again in April 2015.  Moreover, in 2013, McKown was the faculty adviser to an award-winning student newspaper and was not known to have forwarded confidential emails to that newspaper's student reporters, but by 2016, McKown's misconduct had come to light, and she had been removed as adviser.  Comparing 2013 McKown's one-year renewal to 2016 McKown's non-renewal does not support an inference of unlawful retaliation.

## C. Timing

McKown first alleged age, sex, and religion bias on September 2, 2015.  Edgerton submitted his non-renewal recommendation on April 29, 2016, and McKown continued her employment until spring 2017.  McKown contends that the seven-month gap between her allegations and Edgerton's decision constitutes suspicious timing because it was Edgerton's first opportunity to make a renewal recommendation after

McKown's complaint and because Edgerton was continuously reminded of the allegations by her subsequent EEOC charge and the various related proceedings.

"Suspicious timing is generally found when an adverse employment action follows close on the heels of protected expression." *Greengrass v. Int'l Monetary Sys., Ltd.,* 776 F.3d 481, 486 (7th Cir. 2015) (quoting *Kidwell v. Eisenhauer,* 679 F.3d 957, 966 (7th Cir. 2012)).  But "suspicious timing will rarely be sufficient in and of itself to create a triable issue. The reason is obvious: Suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Kidwell,* 679 F.3d at 966.  Even an interval of just seven weeks "does not represent that rare case where suspicious timing, without more, will carry the day."  *Id.* A six-month gap, on the other hand, does not preclude a claim but does "substantially weaken it."  *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017).  Ultimately, although the interval between the initial bias allegations and the nonrenewal decision was longer than the six-month gap in *Burton*, the timing here weighs neither for nor against an inference of retaliation, as Edgerton decided whether to renew McKown's contract at the pre-determined time specified by the contract.

### D.  Evidence of Pretext

McKown largely eschews the *McDonnell Douglas* burden-shifting framework, but nevertheless argues that evidence of pretext supports an inference of unlawful retaliation.  (*See* Pl.'s Mem. 14–20.)  "When confronted with circumstantial evidence of a retaliatory motive, the employer may show that the employee would have been fired

even absent his complaints[.]" *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016). "Of course, an employer's proffered justifications are always susceptible to attack, and [McKown] can avoid summary judgment if a material factual dispute exists on the question of pretext." *Id.*

McKown does not dispute that she received low student evaluation scores and negative student comments. Nor does McKown dispute that she forwarded a confidential email and was removed from her adviser position immediately thereafter. Rather, McKown argues that the student evaluation scores are "problematic" because their calculation is obscure; that she received positive comments in addition to negative comments; and that five of the seven committee members voted for renewal. (Pl.'s Mem. at 16–18, ECF No. 36 at 16–18.) As for her removal as adviser for misconduct, cited by Edgerton as a reason for non-renewal, McKown adduces no evidence of pretext. *See Burton*, 851 F.3d at 698 (affirming summary judgment where the employee "did not dispute the truth of the allegations" but only how the decisionmaker "*perceived* and *characterized* those events"). Indeed, Dr. Whitmore and Assistant Dean Suzanne Reading agreed—prior to McKown's bias allegations—that McKown should be removed from the *Collegian* for her transgression. This alone appears fatal to McKown's pretext argument. *See Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 506 (7th Cir. 2017) ("Where multiple reasons are given, as in this case, the plaintiff faces a greater challenge. Showing that just one reason was a pretext may not be enough."). But even if it were not, her remaining evidence of pretext is unavailing.

"Merely disagreeing with an employer's reasons" is not enough to survive summary judgment.  *Id.*  Whether student evaluation scores are a proper measure of teaching performance, how much stock to put in positive or negative student comments, and how to weigh the recommendations of various committees: "These are exactly the type of personnel management decisions that federal courts do not second-guess."  *Id.*  Courts "intervene only where 'an employer's reason for [an adverse action] is without factual basis or is completely unreasonable.'"  *Id.* (quoting *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013)).

Edgerton's documented dissatisfaction with McKown's same performance issues in the years preceding her non-renewal further undermine any inference of pretext. "Although a retaliation claim can be supported by evidence of sudden dissatisfaction with an employee's performance, particularly when an employee has a generally good record, the evidence in this case belies that characterization."  *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) (internal citation and quotation marks omitted).  The very same shortcomings identified in reviews in 2013 and again in spring 2015—both before McKown's bias allegations—formed the basis for Edgerton's 2016 determination that McKown failed to meet expectations in teaching. Those shortcomings had resulted in renewal for just one year in 2013, and in 2016, when coupled with McKown's removal from the *Collegian* for misconduct, those shortcomings resulted in non-renewal.

In justifying his disagreement with the departmental committee's and professional standards committee's findings that McKown met expectations in service,

Edgerton wrote that the committees "were either not privy or they were being re-spectful of the confidentiality of a carefully considered and executed personnel deci-sion that resulted in her removal" as adviser to the *Collegian*. (ECF No. 37-20 at 5.) At his deposition, Edgerton testified that the committees were not aware of the cir-cumstances behind McKown's removal. McKown contends this statement is evidence of pretext because Edgerton knew that Dr. Whitmore, who was on McKown's depart-mental committee, was involved in the removal decision. But Whitmore testified that Provost Morris instructed her that, in the review process, Whitmore could "acknowledge that [McKown] is no longer adviser to the *Collegian*, but that was it. That's what I took, and, so, we did not go there." (Whitmore Dep. 63:2–14, ECF No. 37-3 at 63.) Whitmore's testimony corroborates Edgerton's written justification— Whitmore, the one committee member privy to the circumstances of McKown's re-moval, was "being respectful of . . . confidentiality." The minor inconsistency between Edgerton's contemporaneous, written justification for non-renewal (that the review-ers either were not aware of the circumstances or were respecting confidentiality) and his deposition testimony more than two years later (that the reviewers were not aware) does not support an inference of pretext.

Edgerton also testified that he was not aware that McKown had filed an EEOC charge. McKown contends that this statement was a lie suggesting pretext. McKown points to Butler's response to McKown's internal grievance, which acknowledges McKown's EEOC charge. Butler, in reply, submits evidence that the relevant para-graph of the grievance response was written by counsel, not by Edgerton. In any

event, Edgerton testified that he was aware of McKown's bias allegations, and it makes little difference whether he was aware of the legal mechanism by which certain of those allegations were made—the antiretaliation provisions protect both participation *and* opposition.  The statement does not appreciably support an inference of pretext.

*E. Summary*

Considering all the evidence—Edgerton's statements, comparison between McKown's renewal reviews in 2013 and 2016, timing, and putative pretext—no reasonable jury could find that an unlawful retaliatory motive was the but-for cause of McKown's non-renewal.  Butler is therefore entitled to summary judgment.

## IV.  Conclusion

For the reasons explained above, Butler's motion for summary judgment is **granted** and McKown's claims are **dismissed** on the merits with prejudice.  A final judgment shall be entered separately.

**SO ORDERED.**

Date: 7/22/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Meghan Uzzi Lehner
CLEVELAND LEHNER CASSIDY
meghan@clcattorneys.com

Scott James Preston
JACKSON LEWIS PC (Indianapolis)
Scott.Preston@jacksonlewis.com

Melissa K. Taft
JACKSON LEWIS PC (Indianapolis)
melissa.taft@jacksonlewis.com